**THIS ORDER IS SIGNED AND ENTERED.**

**Dated: September 11, 2026**

Rachel Blise

**Hon. Rachel M. Blise**
**United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

In re:

Patrick R. Whitty,

Debtor.

Case No. 24-10018-rmb

Chapter 7

---

Brett Bauer,

Plaintiff,

v.

Patrick R. Whitty,

Defendant and Counterclaimant,

v.

Brett Bauer,

Counterclaim Defendant.

Adversary No. 24-00019-rmb

---

## POST-TRIAL DECISION

---

Brett Bauer hired his neighbor, Patrick Whitty, for a significant home renovation project. As often happens with such projects, the renovation was behind schedule and over budget from the beginning. Whitty's business also failed during

the course of the project. The working relationship soured when the project still was not complete after 18 months, and Bauer hired someone else to finish the job. After Whitty filed bankruptcy, Bauer filed this adversary proceeding alleging that Whitty committed theft by contractor and that the resulting debt is not dischargeable under 11 U.S.C. § 523(a)(4). Whitty filed a counterclaim seeking damages for emails that Bauer sent in violation of the stay imposed by 11 U.S.C. § 362(a). For the reasons explained herein, neither party sufficiently proved his claim, and the Court will deny relief on all claims.

**JURISDICTION**

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334 and the order of reference from the district court pursuant to 28 U.S.C. § 157(a). *See* General Order No. 161 (W.D. Wis. June 12, 1984) (available at https://www.wiwd.uscourts.gov/administrative-orders) (last visited September 10, 2026). Determination of the dischargeability of a debt is a core proceeding under 28 U.S.C. § 157(b)(2)(I). To the extent the determination of dischargeability requires consideration of issues impacted by the Supreme Court's decision in *Stern v. Marshall*, 564 U.S. 462 (2011), the plaintiff affirmatively consented to the bankruptcy court's final adjudication of these issues, *see* Dkt. No. 6, ¶ 2, and the defendant consented to the bankruptcy court's final adjudication of the issues by his silence, *see* Dkt. No. 7; *see also Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 683 (2015). *See* Fed. R. Bankr. P. 7008, 7012. This decision constitutes the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and Rule 52 of the Federal Rules of Civil Procedure.

## FINDINGS OF FACT

Whitty has been in the construction business since the late 1990s, when he worked as a laborer for a commercial construction company in his teens. He started Whitty and Sons Construction, LLC (the "LLC") in 2011. Whitty was the sole owner and member of the LLC, and he was solely responsible for the conduct of the business. At various times, Whitty engaged the law firm of von Briesen & Roper to provide legal services to the LLC, including serving as the LLC's registered agent and providing tax and other advice.

From his work for the LLC, Whitty was generally familiar with Wisconsin's construction lien laws, and the lien rights of contractors and subcontractors. Whitty also understood that it was his responsibility to ensure that subcontractors and suppliers were paid. Whitty testified that the LLC had completed many home renovation projects, including several financed through a lender. There was no evidence that the LLC had filed any lien claims itself or had experienced the filing of lien claims by its subcontractors. Nor was there any evidence that the LLC or Whitty himself had ever been accused of theft by contractor before this litigation, or that the LLC had made any such accusations with respect to its subcontractors.

In October 2021, Bauer offered to purchase the real property located at 4102 Veith Avenue in Madison, Wisconsin (the "Property"). He bought the Property knowing that it would need substantial renovations to be suitable for his use. While visiting the Property, he met Whitty, who at the time owned the house across the street, and learned Whitty owned a company that performed home remodeling services.

On October 14, 2021, Bauer and Whitty, on behalf of the LLC, signed a Remodeling Contract (the "Original Contract"). Ex. 11. Whitty testified that he received legal advice from attorneys at von Briesen & Roper with respect to the Original Contract. The scope, subject, and content of that advice is unclear from the record. There is no evidence that Whitty received legal advice regarding his legal obligations under Wis. Stat. § 779.02(5) with respect to funds to be received from Bauer and his lender.

The total price of the Original Contract was $207,300. Bauer immediately paid a deposit of $20,700. The remainder of $186,600 was to be financed through a mortgage lender. Attached to the Original Contract was a set of specifications that included allowances for certain items. (For example, the Original Contract included an allowance of $17,000 for cabinets in the kitchen.) The Original Contract provides that if the actual cost exceeded the allowance for that item, then Bauer would pay the difference, and if the cost was less than the allowance, then Bauer would receive a credit against the contract price. Ex. 11 at 2, § 5.

The LLC received three draws from Bauer's lender under the Original Contract. It received $45,700 on May 31, 2022; it received $94,300 on October 21, 2022; and it received $31,800 on January 5, 2023. In sum, the LLC received $192,500 from Bauer and his lender under the Original Contract. The draw requests that Whitty signed stated that the LLC requests payment "for the purposes of paying the people and companies shown on the schedule, and no others, who have been contracted with or employed by the general contractor for this

project, and who have furnished services, materials or labor to the date of this draw request in the amounts shown next to their names." Exs. 31, 33, 36.

Bauer closed on the house in late 2021. One aspect of the renovation was mold remediation work in the basement. The Original Contract called for the LLC to perform or subcontract and pay for that work, but Bauer paid $2,995 for the mold remediation in December 2021, before the LLC started work on the project. *See* Ex. 23. Neither party explained why Bauer, rather than the LLC, requested and paid for the remediation work if it was included in the Original Contract.

The LLC began work on the project in March 2022. Soon after work began, Bauer began to request alterations to the scope of the remodel. He signed a separate Remodeling Contract (the "Additional Contract") with the LLC on April 13, 2022, with a total contract price of $24,253.89. Ex. 12. The terms of the Additional Contract are substantially similar to the Original Contract, including the allowance provision. Unlike the Original Contract, Bauer planned to fund the entire price of the Additional Contract himself without the involvement of a lender. The contract price was due immediately, with the exception of a $2,000 holdback. Bauer paid the LLC $22,253.89 on April 14, 2022. Ex. 19 at 2.

On May 19, 2022, the parties signed Change Order #1 ("CO1"), which adjusted the terms of the Additional Contract. Ex. 13. The changes added $5,350 to the contract price for the Additional Contract. CO1 provides that 50% of the added price was due on signing. Bauer paid $3,675 on May 20, 2022. He paid the

amount by credit card, and the LLC received $3,511.74 after processing fees. Ex. 2 at 3; Ex. 19 at 3, 6.

On August 8, 2022, the parties signed Change Order #2 ("CO2"), which again adjusted the terms of the Additional Contract. Ex. 15. The changes added $14,229.90 to the Additional Contract. The LLC credited $4,500 against this amount to compensate Bauer for a fireplace insert that Bauer purchased directly for $4,500, making the total price of CO2 $9,729.90. *See id.* at 2. Bauer paid the LLC $11,404.90 on August 10, 2022, which was the total of the adjusted price of CO2 plus the remaining amount due under CO1. Ex. 19 at 9-10.

On September 30, 2022, the parties signed Change Order #3 ("CO3"), which again adjusted the terms of the Additional Contract. Ex. 17. The changes added $9,940.00 to the contract price, with $8,940.00 due at signing. Bauer paid $8,940.00 on October 1, 2022. He paid the amount by credit card, and the LLC received $8,552.16 after processing fees. Exs. 2 at 6; 19 at 11.

The total price of the contracts and change orders was $256,573.79. The LLC received $238,222.69, approximately 93% of the contract price, from Bauer and his lender—$192,500 under the Original Contract and $45,722.69 under the Additional Contract and change orders. Approximately $15,000 was left unpaid under the Original Contract and the Additional Contract, adjusted by the change orders.[1]

[1] The amount is approximate because neither party testified as to who was to be responsible for the credit card fees—i.e., whether Bauer expected to pay a bit more to reimburse the LLC for the fees or whether the LLC expected to attribute that cost as part of the project.

The Original Contract had a project timeline of 110 days, before Bauer requested the changes reflected in the Additional Contract and the change orders. By August of 2022, it was clear that Whitty would not meet the deadline, and Bauer started asking for progress updates and timelines. Ex. 21. His inquiries became more insistent by the end of November 2022, because he had planned to host family gatherings over the holidays. Ex. 22. Whitty repeatedly promised to keep the project moving, but progress was very slow.

Whitty testified that Bauer made many requests during the project that resulted in adjustments and additions to the scope of work specified in the contracts. The Court finds Whitty's testimony to be credible and supported by other portions of the record. Whitty did not contemporaneously memorialize many of the changes. In April 2023, Whitty sent an email with a list of some of the various changes and charges, which totaled $11,010.28 at this point, but the parties never signed a change order. *See* Ex. 204. The Court infers from the testimony that there were many reasons for Whitty's failure to memorialize many of the changes, including that Whitty's business practices were not very organized and that he did not want to upset the relationship with Bauer because the project was already behind. For his part, Bauer did not provide evidence to rebut Whitty's testimony regarding Bauer's many adjustments to the work contemplated in the contracts, except to point out the lack of memorialization. Bauer himself did not testify that he requested no changes or adjustments to the scope of work that would have

resulted in additional costs or labor beyond the Original Contract, the Additional Contract, and the change orders.

Throughout the project, Bauer purchased various supplies, such as faucets, a sink, and two vanities. *See* Ex. 23. Bauer began purchasing these items in February 2022, before the LLC started work on the project. He testified that all or most of the items he purchased were covered by the Original Contract or the Additional Contract and change orders, but he did not explain why he purchased the items himself instead of telling Whitty which items he wanted and having the LLC purchase the items. At one point Bauer mentioned that he purchased some items himself because Whitty and the LLC would receive the items more quickly, but his testimony is unclear on this point and that testimony does not explain why Bauer purchased items even before the LLC started work on the project. Therefore, there is not sufficient evidence in the record for the Court to make a finding regarding the reasons Bauer purchased the items himself. The one exception to this is the tile and other bathroom supplies Bauer purchased in April and June 2023. By then, the project was way behind schedule, and Bauer wanted the bathroom project finished. He also wanted several changes to the original scope of the work. The parties discussed that Bauer would purchase many of the materials directly and Whitty would install them. *See* Ex. 204. Their discussions were never memorialized in a contract or change order.

In or around April 2023, Bauer learned that the LLC had not paid a bill from Wisconsin Building Supply ("WBS"), a supplier that the LLC used for materials

such as interior doors, when WBS sent a notice of intent to file a claim for lien on the Property. To avoid the fixing of a lien on the Property, Bauer paid WBS $2,500. The LLC paid all other amounts due to WBS for the Bauer project. *See* Ex. 219.

Bauer then inquired regarding payments to other subcontractors, and he learned there was an outstanding invoice in the amount of $5,000.37 owed to Preferred Electric, a subcontractor that Whitty hired to do the electrical work for the project. Ex. 24. Bauer paid the invoice to prevent Preferred Electric from exercising its lien rights.

The LLC was having money problems throughout the project, and in early 2023, the LLC failed. Whitty stopped operating the LLC for the most part and obtained employment with another company. Whitty nevertheless continued to work on the Bauer project. Whitty credibly testified that he kept working both because he did not want to leave the project unfinished and because Bauer was his neighbor.

By August of 2023, the project still was not completed. The LLC was insolvent or nearly so at that point. Bauer and Whitty met in August 2023, and during that meeting Whitty indicated that there would be a change order for $4,000. This appears to have been Whitty's attempt to finally memorialize some of the various changes that Bauer had requested along the way with certain credits to Bauer for some of the items he purchased. Ex. 28 at 3. In response, Bauer proposed an amendment to the Original Contract that acknowledged the insolvency of the LLC and would impose drastic consequences for Whitty's failure to perform. Ex. 28.

Bauer testified that he wanted to make Whitty personally liable for the Original Contract because the LLC was no longer operating. The parties' relationship broke down after that, and Whitty stopped all work on the project.

Bauer hired one of the LLC's employees, Corey Jean, to finish the work on the project, along with other tasks that were not included in either the Original Contract or the Additional Contract. According to Jean, the project was 90% or more completed when he began his work. Jean's credible testimony was the only evidence regarding the portion of the work the LLC completed. Based on this testimony, the Court finds that Whitty and the LLC did complete 90% of the work contemplated under the Original Contract, the Additional Contract, and the change orders.

Whitty filed a chapter 7 petition on January 5, 2024, but he did not include Bauer on his list of creditors or schedule of debts. *See In re Whitty*, Case No. 24-10018, Dkt. No. 1. On January 19, 2024, Bauer asked about Whitty's intent "for repayment of items that I prepaid for?" Ex. 30 at 2. In response, Whitty stated on January 28, 2024, "We'll have to discuss what the amount is." *Id.* Bauer then responded that he would "circle back when things are wrapping up around May/June with some numbers." *Id.* On February 2, 2024, Whitty amended his list of creditors and schedule of debts to add Bauer as a creditor with the claim amount as "Unknown." Case No. 24-10018, Dkt. No. 11. Whitty's counsel sent notice of the bankruptcy to Bauer on February 2, 2024, and the Bankruptcy Noticing Center also sent notice of the bankruptcy to Bauer on February 4, 2024. *Id.* Dkt. Nos. 12, 13.

On March 28, 2024, Bauer wrote the following email to Whitty:

> Pat,
>
> Given the bankruptcy documents I received shortly after this email [meaning Bauer's January 30 email], I can only assume you did and presently do not actually intend to repay me for items I paid for under our various agreements, costs of supplies and labor to finish the project you chose to walk away from on August 11, 2023, and other costs incurred by me due to non-performance.
>
> I am hereby demanding repayment of these items in the amount of $35,032.56 by the end of day Tuesday, April 2nd 2024. If you intend to make payment by Tuesday and would like to discuss how I arrived at that number or discuss an alternative but reasonable amount to be paid by Tuesday, let me know and we can discuss.
>
> I will assume non-payment by end of day Tuesday to mean you are refusing to repay me for the above.
>
> -Brett

Ex. 30 at 1-2. Whitty responded, "That's interesting Brett…. ur demanding I pay $36k in 5 days for items you don't even describe in ur email." *Id.* at 1.

Bauer responded the next day stating, "Similar to me being looped into your bankruptcy shortly after asking what your plan for repayment was, I guess." *Id.* at 1. Bauer also provided a list of items he asserted were included in the figure provided in his earlier email. Bauer claimed that he sent these emails to Whitty on the advice of an attorney, who told him he needed to make a demand before he would have a claim against the LLC. When asked for details about the attorney, Bauer provided no further information and said he could not even provide the name.

Bauer filed an adversary complaint on April 5, 2024, alleging that Whitty is liable to him for theft by contractor under Wisconsin law and that the debt is

nondischargeable under 11 U.S.C. § 523(a)(4). Despite the LLC having completed more than 90% of the work on Bauer's project, Bauer now claims that the LLC misappropriated "between 70% and 84%" of the funds the LLC received for the project, and he claims his damages are "between $167,149.10 and $201,212.04." Dkt. No. 35 at 10, 22.

The Court held a trial during which the Court heard testimony from Jerrilee Young, an account manager at Wisconsin Building Supply; Corey Jean, a former employee of the LLC; Brett Bauer; and Patrick Whitty.

## DISCUSSION

### I. BAUER'S CLAIM UNDER 11 U.SC. § 523(a)(4)

Bauer's complaint includes a single claim for a declaration of nondischargeability under 11 U.S.C. § 523(a)(4).[2] That section excepts from discharge debts "for fraud or defalcation while acting a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4).

Generally, there are two steps in any nondischargeability analysis. The first is determining whether the debtor owes a debt to the creditor under non-bankruptcy law. *S & L Enters. I, LLC v. Eisaman (In re Eisaman)*, 387 B.R. 219, 224 (Bankr. N.D. Ind. 2008) ("[T]he first step in determining whether or not a particular debt is dischargeable is to make certain that there is, indeed, a debt owing by the debtor to the creditor."); *In re Osula*, 519 B.R. 361, 377 (Bankr. D.

[2] After trial, Bauer filed a motion to amend the complaint to include a claim under § 523(a)(2)(A), arguing that a portion of the debt was based on fraud. Dkt. No. 36. The Court denied that motion, concluding that Whitty did not have fair notice of the claim before or during trial. Dkt. No. 43.

Mass. 2014) ("A plaintiff is required to establish both that he has a valid claim against a debtor *and* that the claim should not be discharged in bankruptcy.") (emphasis in original). The second step is determining whether the creditor has met its burden to prove that the debt is nondischargeable under the applicable subsection in § 523(a).

The underlying debt for Bauer's nondischargeability claim is theft by contractor under Wis. Stat. §§ 779.02(5), 895.446(1), and 943.20. Wisconsin's theft by contractor statute provides in relevant part:

> THEFT BY CONTRACTORS. The proceeds of any mortgage on land paid to any prime contractor or any subcontractor for improvements upon the mortgaged premises, and all moneys paid to any prime contractor or subcontractor by any owner for improvements, constitute a trust fund only in the hands of the prime contractor or subcontractor to the amount of all claims due or to become due or owing from the prime contractor or subcontractor for labor, services, materials, plans, and specifications used for the improvements, until all the claims have been paid, and shall not be a trust fund in the hands of any other person. The use of any such moneys by any prime contractor or subcontractor for any other purpose until all claims, except those which are the subject of a bona fide dispute and then only to the extent of the amount actually in dispute, have been paid in full or proportionally in cases of a deficiency, is theft by the prime contractor or subcontractor of moneys so misappropriated and is punishable under s. 943.20. If the prime contractor or subcontractor is a corporation, limited liability company, or other legal entity other than a sole proprietorship, such misappropriation also shall be deemed theft by any officers, directors, members, partners, or agents responsible for the misappropriation.

Wis. Stat. § 779.02(5).

The statute is designed to "assist subcontractors and their subcontractors and suppliers in getting paid and to protect owners and prime contractors from

paying twice." *Kraemer Bros. v. Pulaski State Bank*, 138 Wis. 2d 395, 402, 406 N.W.2d 379, 383 (1987). "Until all claims for labor and materials are paid, the contractor's interest in the money paid to him by the owner to the extent of the amount of all claims due and to become due for that project is merely as a trustee." *State v. Blaisdell*, 85 Wis. 2d 172, 178, 270 N.W.2d 69, 73 (1978).

The statute is akin to strict liability—it is not necessary to show that the contractor intended to misappropriate the funds. *See Burmeister Woodwork Co., Inc. v. Friedel*, 65 Wis. 2d 293, 222 N.W.2d 647 (1974) ("In a civil action for conversion of trust funds it is not necessary to show wrongful intent to defraud."). In addition, an individual officer or agent of a corporate entity responsible for the misappropriation is personally liable for the damages caused. *Capen Wholesale, Inc. v. Probst*, 180 Wis. 2d 354, 369-70 509 N.W.2d 120, 126 (Ct. App. 1993).

Here, it is not necessary to determine whether Whitty violated the theft by contractor statute. A bankruptcy court may skip to the second step of the nondischargeability analysis when the creditor has not met its burden on the elements of its § 523(a) claim. *See, e.g.*, *Holton v. Zaidel (In re Zaidel)*, 553 B.R. 655, 658 n.1 (Bank. E.D. Wis. 2016) ("Because the court finds that the alleged debt is dischargeable, regardless of the amount, it need not determine any remaining issues of state law, such as liability or the amount of damages, if any."). Here, the Court addresses only the elements of Bauer's nondischargeability claim, because Bauer did not meet his burden of proof. The Court need not address Whitty's liability for theft by contractor or the scope of Bauer's damages, if any.

### A. Bauer Bears the Burden of Proof.

Before proceeding to the merits of Bauer's nondischargeability claim, we pause to consider the burden of proof. "The basic purpose of a discharge in bankruptcy is to give debtors a fresh start." *O'Hearn v. Educ. Credit Mgmt. Corp. (In re O'Hearn)*, 339 F.3d 559, 563 (7th Cir. 2003). "Congress nevertheless has decided that various considerations of public policy require that certain debts be excluded from the general principle of discharge." *Id.* Those exceptions to discharge "must be strictly construed in favor of the debtor to comply with the 'fresh start' policy underlying the Bankruptcy Code." *Chicago & Vicinity Laborers' District Council Pension Fund v. Bright (In re Bright)*, 655 B.R. 464, 472 (Bankr. N.D. Ill. 2023). An objecting creditor must prove the elements of its nondischargeability claim by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 286-87 (1991); *see also Estate of Cora v. Jahrling (In re Jahrling)*, 816 F.3d 921, 925 (7th Cir. 2016) ("The objecting creditor bears the burden of proving by a preponderance of the evidence that an exception to discharge applies.").

Bauer's post-trial briefing conflates the burden of proof under state law with his burden of proof under § 523(a)(4). He suggests that Whitty had an obligation to demonstrate that he did not misappropriate the project trust funds. *See* Dkt. No. 41 at 7-13. It is possible that a contractor trustee may have some burden under Wis. Stat. § 779.02(5) to prove that the funds were spent appropriately. This would be in keeping with law related to other fiduciary relationships that once a plaintiff establishes a trustee or fiduciary relationship, the trustee has a duty to fully and fairly account for the trust assets. *See, e.g.*, *In re Martin's Trust Estate; Barry v.*

*Richards*, 21 Wis. 2d 334, 347-48, 124 N.W.2d 297, 305 (1963) ("The defendant contends the burden of proof is on the plaintiffs to show loss or damage and failing this, the trustee's account should be approved. We do not agree. It is the primary duty of the trustee to make full, accurate, and complete accounts. It is not the duty of the appellants to supply the omissions.") (citations omitted); *In re Allis' Est.*, 191 Wis. 23, 209 N.W. 945, 958 (1926) ("The burden is on the trustee to fully and fairly account for its trust."); *Hazelton v. New York Life Ins. Co.*, 148 Wis. 19, 134 N.W. 131, 132 (1912) ("The burden is on the trustee to show that he made no profits or received no benefit from the money; and if he refuses to account, or to show the amounts of profits received, the court will give compound interest, in order that it may be certain that the cestui que trust gets the profits on the trade or business in which the trustee has employed the money.") (quoting 1 Perry on Trusts, § 471).

To establish his theft by contractor claim under § 779.02(5), it may be that Bauer could require Whitty to substantiate how the LLC spent the trust funds, though the Court does not address that issue here. *See Ruck v. McGill (In re McGill)*, 653 B.R. 904, 907 (Bankr. E.D. Wis. 2023) ("Unless the Bankruptcy Code otherwise provides, burdens of proof follow the non-bankruptcy law giving rise to claims against the debtor.") (citing *Raleigh v. Ill. Dept. of Revenue*, 530 U.S. 15, 21-26 (2000)). Proof of liability for theft by contractor would establish only that Whitty owed Bauer a debt. Bauer must still prove the elements of his claim under § 523(a)(4). The law is clear that Bauer has the burden to present sufficient evidence for the Court to declare the debt to be nondischargeable.

Bauer cites *Lenfant v. Hall (In re Hall)*, 581 B.R. 864 (Bankr. W.D. Wis. 2018), in support of his argument that Whitty bears some burden under § 523(a)(4) to prove how he spent the funds. Dkt. No. 41 at 7-8. In *Hall*, the court stated, "Defalcation has . . . been defined as 'a failure to account for money or property that has been entrusted to another.'" 581 B.R. at 869 (quoting *Deady v. Hanson (In re Hanson)*, 432 B.R. 758, 775 (Bankr. N.D. Ill. 2010)). The court in *Hall* faulted the debtor-defendant for failing to produce records related to the trust funds and noted "[p]lacing the burden on the Plaintiffs under the facts before the Court would create an impossible task." *Id.* The court then appears to have placed the burden on the debtor-defendant:

> Defendant failed to account for expenditures from the trust funds and provided mostly unidentified receipts and estimates. This is more than sufficient to constitute defalcation for the purposes of section 523(a)(4). Defendant was given ample opportunity to produce documents proving the funds were expended for the purposes required. He had the opportunity to do so at trial and to identify and explain each of the 35 receipts or estimates that were admitted into evidence. He did not do so. Where, as here, the information and detail necessary to establish the disbursement of the trust funds was solely and exclusively under the control of Defendant, Plaintiffs can be expected to do no more than establish the amount of the trust *res* and that they received no accounting to establish a prima facie case. The burden in this case then shifts to Defendant to present some explanation and accounting in order to rebut that prima facie case. He did not do so.

*Id.* at 869-70.

To the extent the *Hall* court placed any burden on the debtor-defendant with respect to the elements of the creditor's claim under § 523(a)(4), this Court respectfully disagrees with that conclusion. The *Hall* court's burden-shifting

analysis seems to be based on the language from the *Hanson* case it quoted, which suggests that mere failure to account for trust funds can constitute defalcation as that term is used in § 523(a)(4). *See Hall*, 581 B.R. at 869.

*Hall*'s reliance on *Hanson* is misplaced. Immediately after the *Hanson* court stated that defalcation is "a failure to account for money or property that has been entrusted to another," the court went on to say that "[a]n objective standard is used to determine defalcation, and intent or bad faith is not required." *Hanson*, 432 B.R. at 775. *Hanson* was decided before the Supreme Court's decision in *Bullock v. BankChampaign, N.A.*, 569 U.S. 267 (2013). There, the Supreme Court held that defalcation under § 523(a)(4) requires "an intentional wrong." *Id.* at 273-74. To the extent *Hanson* held that intent is not required to prove defalcation, the ruling in *Hanson* has been abrogated by *Bullock*. A creditor seeking to have his debt excepted from discharge bears the burden of proving that the debtor acted with the requisite intent. Proof of a mere failure to account for trust funds is not sufficient to prove defalcation under § 523(a)(4).

To be sure, a debtor's "knowledge of the [theft-by-contractor] statute, the circumstances surrounding the violation [of § 779.02(5)], and the degree to which the defendant acted in his own self-interest" is "relevant evidence from which inferences of culpability can be drawn." *Hall*, 581 B.R. at 868. A debtor's failure or refusal to provide information can be considered as evidence of his knowledge and intent. But the debtor does not have any burden to provide evidence in connection

with the requirement that a creditor prove intent for a debt to be excepted from discharge under § 523(a)(4).[3]

### B. Bauer Did Not Prove the Elements of His § 523(a)(4) Claim.

To succeed on a claim under 11 U.S.C. § 523(a)(4), the creditor must establish that there is an underlying debt. The creditor also must prove that (1) the debtor acted as a fiduciary to the creditor at the time the debt was created; and (2) the debt was caused by fraud or defalcation. *Jahrling*, 816 F.3d at 925.

The Court has assumed for purposes of this opinion that there is an underlying debt for theft by contractor under Wis. Stat. § 779.02(5). The Court also has assumed that Wisconsin's theft by contractor statute imposes fiduciary duties on contractors and their responsible agents, including the LLC and Whitty. *See Stoughton Lumber Co. v. Sveum*, 787 F.3d 1174, 1176-77 (7th Cir. 2015). Finally, the Court has assumed that the LLC and Whitty breached their fiduciary duties as required under § 523(a)(4). The only issue the Court addresses is whether that breach is "defalcation" under § 523(a)(4).

"Defalcation" requires "intentional conduct that the fiduciary knows is improper" or reckless conduct where "the fiduciary consciously disregards (or is willfully blind to) a substantial and unjustifiable risk that his conduct will turn out

---

[3] Placing the burden entirely on the creditor to establish the elements specific to a § 523(a)(4) claim does not mean the creditor bears the full burden with respect to establishing the existence of an underlying debt. Whether the debt exists is determined by non-bankruptcy law, which may include burden shifting. *See Grogan*, 498 U.S. at 283 ("The validity of a creditor's claim is determined by rules of state law."); *see also, e.g.*, *In re Scott*, 481 B.R. 119, 138 (Bankr. N.D. Ala. 2012) ("Whether a plaintiff has standing to object to the dischargeability of a debt is, of course, based on whether that party *has* a debt to object to. In bankruptcy, whether there is a debt is a question of state law.").

to violate a fiduciary duty." *Bullock*, 569 U.S. at 273-74 (cleaned up). "The risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves *a gross deviation* from the standard of conduct that a law-abiding person would observe in the actor's situation." *Id.* (cleaned up). "[N]egligence is not sufficient to show defalcation within the meaning of § 523(a)(4)." *Jahrling*, 816 F.3d at 926.

To intentionally disregard a fiduciary duty, the fiduciary necessarily must know that he has a fiduciary duty. *See In re St. Antoine*, 533 B.R. 743, 749 (Bankr. E.D. Wis. 2015). In the context of theft by contractor, the contractor must know that Wisconsin law imposes a fiduciary duty on funds received from owners or their lenders for construction project *and* the contractor must violate that duty with the requisite intent.

The Court concludes that Bauer did not sustain his burden to prove that Whitty knew that the LLC had fiduciary duties or was willfully blind to or consciously disregarded circumstances that would have led him to believe that the LLC was a trustee. The Court also concludes that, even if Whitty knew or suspected the LLC was a trustee, Bauer did not prove that Whitty knew or consciously disregarded facts that would have led him to know that the funds the LLC received from Bauer and his lender were not being spent on the project.

Before discussing the evidence of Whitty's knowledge and intent, a few words on the evidence the Court has considered. The parties submitted into evidence hundreds of pages of text messages, time records, and other information. *See, e.g.*,

Exs. 5, 23, 29, 40-41, 105, 107-08, 112-17, 141, 205. The Court cautioned the parties that it would review only the pages and exhibits referred to during the testimony or cited in the parties' post-trial briefs. The Court has not scoured the pages of these exhibits looking for information that might support an inference regarding Whitty's knowledge and intent. *See, e.g.*, *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs."). The Court's findings are based on the testimony at trial and the documents submitted in evidence and the pages specifically discussed at trial or cited in the parties' briefs.

***1. There is not sufficient evidence that Whitty knew he had a fiduciary duty.***

A debtor must know that he has fiduciary duties under Wis. Stat. § 779.02(5) before his debt can be declared nondischargeable under § 523(a)(4). Where there is insufficient evidence of actual knowledge, proof that the debtor was willfully blind to his obligations under the statute will suffice. *St. Antoine*, 533 B.R. at 749-750. "[A] willfully blind defendant is one who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts." *Glob.-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011); *see also Stoughton Lumber*, 787 F.3d at 1177 (describing defendant's willful blindness as occurring when "he suspected that he was violating the law but avoided confirming his suspicion in order to preserve a patina of innocence"). A debtor's experience in the construction industry alone will not lead to an inference that he has knowledge of or was willfully blind to his duties under

Wis. Stat. § 779.02(5). *See St. Antoine*, 533 B.R. at 749; *In re Koch*, 197 B.R. 654, 658-59 (Bankr. W.D. Wis. 1996).

Here, Whitty credibly testified that he did not "understand the exact laws in terms of holding money in trust" until sometime in 2023. By that time, he had received and spent all payments from Bauer and his lender. Before then, he did not understand that he had a fiduciary duty under Wisconsin law or that the funds he received from owners and lenders were trust funds.

Bauer argues that Whitty's testimony is not credible, pointing to the following facts to support this argument. First, Whitty has much experience in the construction industry, having worked in construction since high school and owning his own business for over ten years at the time of the project. Dkt. 35 at 13. The fact of Whitty's experience alone is not sufficient to provide actual knowledge of Wisconsin's trust fund and theft by contractor laws. *See Koch*, 197 B.R. at 659 (debtor's "experience alone" does not "support the inference that he had, or should have had, knowledge of the trust fund requirements and that his failure to pay over funds received from owners to [the creditor subcontractor] constitutes a more-than-negligent breach of fiduciary duty").

This case is different from *Stoughton Lumber v. Sveum*, where the bankruptcy court concluded that the debtor's "protestations of innocence" were not credible given his forty years of experience as a home builder. 787 F.3d at 1176-77. Whitty was not a home builder. His business involved smaller remodeling projects. He subcontracted some aspects of his projects, but much of the work was done by

his own employees, whom he paid on a regular basis without regard to when he received funds for a particular project.

Second, Whitty testified that he understood that he had an obligation to ensure that subcontractors and suppliers were paid during the project. He also had a general understanding of the contractor lien laws in chapter 779 of the Wisconsin Statutes, and the Original Contract, which he prepared, provides that the LLC has an obligation "to see that all potential lien claimants are duly paid." Ex. 11 at 4; Ex. 12 at 4. Bauer argues that Whitty should have understood that "duly" means lawfully, and that he therefore should have known that the LLC had fiduciary duties under Wisconsin law (or that he was under a conscious duty to learn the applicable legal requirements). Dkt. No. 35 at 12-13.[4] An understanding of Wisconsin's construction lien laws does not necessarily lead to an understanding of a contractor's fiduciary duties with respect to project funds. There was no evidence that the LLC had ever been involved in a situation where the LLC had to enforce its lien rights or that a subcontractor enforced its lien rights after not being paid by Whitty or the LLC. Moreover, while the construction lien provisions are in the same chapter as the theft by contractor statute, Whitty is not a lawyer and has no formal education beyond high school. There is no evidence that he ever read the statute itself such that he could have discovered his obligation. Whitty's limited knowledge of the lien rights statute does not lead to an inference that he had any

[4] Bauer also argues that "[a] law-abiding person would have made sure his company met the requirements of its contract . . . ." Dkt. No. 35 at 12. Liability for breach of contract is not the same as liability for defalcation while acting in a fiduciary capacity.

knowledge of his trust fund obligations. *See St. Antoine*, 533 B.R. at 750 ("The Debtors' limited interaction with the lien rights portion of the statute does not support finding that the Debtors were willfully blind to their obligations as trustees, a provision contained in another section of the statute.").

Third, Bauer notes that Whitty received legal advice regarding the contracts with Bauer. Dkt. No. 35 at 13. The mere fact that Whitty received legal advice from attorneys at a sophisticated law firm is not evidence that he necessarily must have received legal advice regarding the LLC's fiduciary duties under Wisconsin law. Legal advice regarding a construction contract is not the same as legal advice regarding a contractor's various duties under Wisconsin law. Unless asked, lawyers generally do not give general guidance on how to comply with every legal aspect of a client's business.

The Court finds Whitty's testimony about his lack of knowledge of Wisconsin's theft by contractor statute to be credible. The evidence Bauer cites does not lead to an inference that Whitty actually knew that the project funds were trust funds or that the LLC had fiduciary duties with respect to the funds. Nor does any of this evidence suggest that Whitty should have known or consciously disregarded or was willfully blind to the duties imposed by Wisconsin's theft by contractor law. There was no evidence that, for example, Whitty had ever learned about the laws in a licensing course, that Whitty or the LLC had ever been sued or received a demand letter related to the LLC's fiduciary duties under the theft by contractor statute, or that Whitty had ever had to enforce the law himself against one of his

subcontractors. Without knowledge that the LLC even had fiduciary duties for the project funds, Whitty could not have intentionally violated those fiduciary duties.

***2. There is not sufficient evidence that Whitty knew he was violating a fiduciary duty.***

Bauer also presented insufficient evidence that Whitty knew he was violating a fiduciary duty under Wis. Stat. § 779.02(5). Even if Whitty had known about the LLC's fiduciary duties for the project funds, there is not enough evidence for the Court to conclude that Whitty had knowledge of (or that was he willfully blind to) any violation of those fiduciary duties.

The parties spent much time at trial discussing the various lists of costs for labor, subcontractor payments, and materials for the project that Whitty prepared. Exs. 214-220. This information might be helpful to determining whether Whitty and the LLC violated Wis. Stat. § 779.02(5), because proof of intent is not required for theft by contractor liability. *Burmeister Woodwork*, 65 Wis. 2d at 301 ("In a civil action for conversion of trust funds it is not necessary to show wrongful intent to defraud."). On their own, however, the spreadsheets do not amount to proof that Whitty knew he was breaching his duties under the theft by contractor statute because the spreadsheets were created years after the fact and do not shed light on what Whitty knew or intended at the time the money was spent. For the Court to conclude that Whitty acted with the requisite knowledge and intent under § 523(a)(4), there must be evidence regarding what Whitty knew and intended at the time the money was spent.

Bauer relies heavily on his "lowest intermediate balance" spreadsheets to prove that Whitty had knowledge he was violating the theft by contractor statute or was willfully blind to his responsibilities regarding the funds for the Bauer project. *See* Exs. 1, 2. The LLC used a single bank account for all its operations. During the Bauer project, the LLC was working on several different remodeling projects. All monies the LLC received from any of its many projects were deposited into the LLC's single bank account, and all the LLC's expenses were drawn from that account. Whitty did not keep separate ledgers for each project or otherwise segregate the funds in the bank account by project.[5] Bauer notes that the balance in the LLC's bank account was depleted completely in the days and weeks following receipt of each payment from Bauer and his lender. *See* Exs. 1, 2. He argues that the depletion of the bank account necessarily means that Whitty knew the Bauer project funds were used for other purposes.

For this argument, Bauer relies on *Kepler v. Woods (In re Larson)*, 206 B.R. 945 (Bankr. W.D. Wis. 1997), and *McDonald v. Little Limestone, Inc. (In re Powers Lake Construction Co.)*, 482 B.R. 803 (Bankr. E.D. Wis. 2012). Neither case is applicable here. In *Larson*, the debtor sold a vehicle on consignment but did not deliver the vehicle. 206 B.R. at 945-46. The debtor paid $34,700 to the purchaser to reimburse the purchase price of the undelivered vehicle and filed bankruptcy less

[5] While this certainly is not the *best* business practice for a company that holds trust funds, nothing in the theft by contractor statute requires segregation of project funds or real time accounting of project funds. In the Court's experience with such cases, small contractors like the LLC often follow a similar practice of using a single bank account. For this reason, the LLC's use of a single bank account is not helpful to determining whether Whitty intended to misappropriate project funds.

than 90 days later. *Id.* at 946. The chapter 7 trustee sought to recover the payment as a preferential transfer. The purchaser/transferee argued that the debtor held the funds subject to a constructive trust and therefore did not have legal title to the funds as required for a preferential transfer. *Id.* at 947. In the time between receiving funds from the purchaser and later making a payment back to the purchaser, the debtor's bank account had depleted to zero. The court applied the "lowest intermediate balance" rule to conclude that the funds held by the debtor had lost their character as trust funds because the money paid to the purchaser could not have been the same funds subject to a constructive trust that the debtor had received from the purchaser. *Id.* ("[I]f the *res* of a constructive trust is commingled and subsequent withdrawals and deposits are made, the maximum traceable *res* is the 'lowest intermediate balance.'").

In *Powers Lake Construction*, the debtor was a subcontractor and made a payment of $10,919.42 to a material supplier less than 90 days before the petition date. 482 B.R. at 805-06. When the chapter 7 trustee sought to recover the payment as a preferential transfer, the supplier argued that the funds it received were trust funds under Wis. Stat. § 799.02(5). The court held that the funds paid to the supplier were not trust funds for the project. *Id.* at 806-07. After the debtor received a payment from the general contractor and before the debtor paid the supplier, the balance in the debtor's bank account was negative. The funds that the debtor used to pay the supplier therefore could not have been the trust funds received from the general contractor. *Id.* at 807.

These cases regarding the legal entitlement to funds transferred by a debtor for purposes of evaluating allegedly preferential transfers are unhelpful to determining whether the contractor's responsible agents had knowledge of any misappropriation of funds or breach of fiduciary duty. Unlike *Larson* and *Powers Lake Construction*, the issue here is not whether specific funds spent by Whitty or the LLC were trust funds. Rather, the issue is whether Whitty knew that the project trust funds were misappropriated.

Bauer's theory that the immediate bank account depletion is necessarily evidence that Whitty had knowledge the funds were misappropriated seems to be premised on an argument that a contractor cannot make any payments for labor, supplies, materials, or subcontractors until the contractor receives payment from the owner or the owner's lender. The contractor must then use those trust funds (and only those trust funds) to pay for labor, supplies, materials, and subcontractors. This interpretation is not consistent with the statute or the general practice of contractors in Wisconsin.

A contractor must hold funds in trust until all project expenses "due or to become due" are paid. Wis. Stat. § 799.02(5). This language does not require that contractors wait to pay for project expenses until the monies are received; contractors are free to pay all expenses of a project before receiving any payment for the project. If a contractor does pre-pay expenses before receiving payment, then the later payment is not a trust fund because the contractor already satisfied its obligation under the statute. *State v. Sobkowiak*, 173 Wis. 2d 327, 334, 496 N.W.2d

620, 624 (Ct. App. 1992) ("[I]f all claims due or to become due or owing from Sobkowiak for labor and materials had been paid and a balance remained from the $65,000 draw, Sobkowiak was free to use the balance for personal and other corporate purposes.").

Similarly, a contractor can reimburse itself for expenses of the project incurred and paid before receiving payment from the lender. *Sobkowiak*, 173 Wis. 2d at 335, 496 N.W.2d at 624 ("Sobkowiak correctly states that he was entitled to reimburse himself for payments he had made for labor and materials on the Friell job before he received the $65,000 draw.").[6] Indeed, such a procedure is virtually required for many projects, because contractors often must complete work before they are paid for it.

Whitty credibly testified that when a title company is involved in making disbursements under a contract, as was the case for the Bauer project, he could not request payment until he had completed a certain amount of the work. These "progress payments" were tied to the work completed. Whitty testified that the LLC paid for labor and materials to complete the work before receiving payment, so the payments the LLC received from Bauer's lender reimbursed the LLC for

[6] Bauer seems to take issue with this principle, arguing that a contractor may not reimburse itself from trust funds and relying on *St. Croix Reg'l Med. Ctr. v. Keller*, 2016 WI App 67, 371 Wis. 2d 564, 884 N.W.2d 534 (unpublished per curiam). *See* Dkt. No. 41 at 7. The *Keller* decision is not binding precedent in Wisconsin, and it cannot be cited in Wisconsin state courts. *See* Wis. Stat. § 809.23(3)(b). To the extent *Keller* conflicts with *Sobkowiak*, the Court declines to follow it. Moreover, the passage in *Keller* to which Bauer cites appears to relate to the contractor's burden on a theft by contractor claim. As noted, the Court has assumed the LLC committed theft by contractor. The only issue addressed in this opinion is whether Bauer provided sufficient evidence of Whitty's knowledge and intent as required under 11 U.S.C. § 523(a)(4).

expenses already incurred and paid. Bauer did not present any evidence rebutting Whitty's testimony in this regard.

With respect to the payments the LLC received from Bauer's lender, Whitty provided a credible, plausible explanation why the depletion of the LLC's bank account shortly after receipt of the payments did not give him knowledge that the Bauer funds were not being spent on the Bauer project. The LLC's work was inspected by the title company, and the LLC received payment only if the title company agreed that the work was completed as represented in the draw request.[7] Whitty paid his employees and purchased supplies contemporaneously as the work progressed, so he believed most or all of the costs associated with the work under the lender draws were already paid for and that the draws reimbursed the LLC for money already spent.

Whitty's explanation is not quite as plausible with respect to the payments received directly from Bauer.[8] Some of those funds were exhausted within days after receipt of the payments and before the LLC could have paid for or completed the work. *See* Ex. 1 at 2, 3, 5, 6. Nevertheless, the Court finds credible Whitty's testimony that he did not have knowledge Bauer's funds were spent on costs or

---

[7] For this reason, Bauer's argument that he was "pressured" to sign the third draw request in late December 2022 is not evidence of Whitty's intent to mislead Bauer regarding the use of project funds. *See* Dkt. No. 35 at 19. Whitty testified, and Bauer did not dispute, that the title company would review the request and would release the funds only if appropriate based on the work completed.

[8] The LLC received the following trust fund payments from Bauer: $22,253.89 for the Additional Contract, $3,511.74 for CO1, $11,404.90 for CO2, and $8,940.00 for CO3. Bauer agrees that the initial deposit of $20,700 that he gave the LLC in October 2021 was not subject to the trust fund requirements in Wis. Stat. § 779.02(5). *See* Dkt. No. 35 at 4-5.

expenses unrelated to the project. Whitty testified that Bauer requested many changes to the scope of the project that were not memorialized in a change order or other agreement. This caused the LLC to spend more than estimated on labor and material costs. The LLC paid for those items contemporaneously, with employees being paid on a regular schedule and a debit card used to purchase supplies at retailers like Menards and Ace Hardware. Whitty believed that all the money Bauer gave him was spent on items for the project. Whitty even notified Bauer of additional costs in April 2023. Ex. 204. Bauer presented no evidence to contradict Whitty's testimony that there were many changes and adjustments to the scope of the work.

Bauer points to the following evidence to undermine Whitty's credibility and argue that Whitty knew or consciously disregarded the LLC's violation of its fiduciary duties for the project funds. First, Bauer points to the depleted balance in the bank account. Bauer's argument seems to be that if the money was gone and the project wasn't finished, then Whitty should have known the money was misappropriated. But Bauer did not point to any particular item the LLC spent money on that would have demonstrated Whitty's knowledge that the project funds were being misused. Indeed, Bauer's counsel spent significant time arguing that the Court should not (and could not) even review the individual transactions on the LLC's bank statements. Without more information regarding the reason the bank balance was depleted, the Court finds that the bank account balance alone is not

helpful in light of Whitty's credible explanations regarding the LLC's use of the funds.

Second, Bauer argues that Whitty's various spreadsheets of labor, material, and subcontractor costs are not accurate and therefore demonstrate that Whitty knew the LLC misappropriated the project funds. The Court agrees with Bauer that Whitty's ever-changing, after-the-fact attempts to establish the expenses for the project do not instill confidence that all the project funds were in fact spent on project expenses. But Whitty's later inability to establish precisely how the project funds were spent is not sufficient evidence of his knowledge or intent at the time of the misappropriation. The Court must examine the evidence available at the time of the misappropriation.[9] Whitty credibly testified that, while he did not track expenses for the Bauer project, he genuinely believed the money the LLC spent on the project was at least as much as the LLC received from Bauer and his lender. This belief was backed by Whitty's uncontested testimony regarding the many changes that Bauer requested, which increased the costs for the project, even though Whitty did not attempt to memorialize those extra costs until much later in the project.

Moreover, the evidence indicates that Whitty and the LLC completed at least 90% of the work under the contracts and received 93% of the contract price. Whitty also credibly testified that there were extra costs for labor and materials based on

[9] Bauer agrees that the Court ought to examine Whitty's intent at the time of the misappropriation. *See* Dkt. No. 41 at 5.

Bauer's various requested changes, in the amount of *at least* $11,010.28. Ex. 204. Thus, the percentage of work completed lines up with the percentage of payment the LLC received. Bauer appears to argue that much of the work was completed after the money was already gone, indicating Whitty knew it was misappropriated. Bauer says Whitty kept working after the funds were depleted because "he didn't know what else to do" or because he wanted to forestall or avoid litigation. Dkt. No. 41 at 4-5. The Court declines to make this inference. Whitty credibly testified that the project was over budget and that he kept working despite not having a signed change order because he wanted to finish what he started and because Bauer was his neighbor.

Third, Bauer points to the unpaid invoices from Preferred Electric and Wisconsin Building Supply. Bauer paid Preferred Electric $5,000.37 in April 2023 for an invoice the LLC had not paid for work on the project. Ex. 24. This unpaid invoice did not give Whitty knowledge that the LLC had violated its fiduciary duties under the theft by contractor statute. The LLC had previously paid Preferred Electric $10,797.44 for invoices related to the project. Ex. 26. The Original Contract, CO1, and CO2 included allowances for electrical work in the total amount of $10,100. *See* Ex. 11 at 10 ($4,500 in Original Contract); Ex. 13 at 1 ($4,050 in CO1); Ex. 15 at 1 ($1,550 in CO2). By the time of the unpaid invoice, the LLC had already paid more for electric work than budgeted.[10] The parties later agreed that

---

[10] The draw request that the LLC submitted on December 30, 2022 does indicate that $2,050 of the draw would be paid to Preferred Electric. Ex. 36 at 2. As noted, Whitty testified to a belief that the

Bauer would get a credit of $2,296.74 for his payment of the invoice, slightly less than half of what he paid. *See* Ex. 28. This suggests Whitty had a good faith belief that Bauer would be responsible for some or all of the invoice because the electrical allowance had already been exhausted.[11] Whitty did not discuss the matter with Bauer when he received the invoice (or as electrical costs mounted along the way), but Whitty's disorganization as his business was failing does not amount to knowledge of or willful blindness to the LLC's violation of a fiduciary duty based on the unpaid invoice.

In November 2022, the LLC received invoices from Wisconsin Building Supply for materials on the project, including things like interior doors. The LLC did not pay those invoices immediately, and in March 2023, WBS suspended the LLC's account because the invoices had not been paid. On May 1, 2023, WBS filed a Claim for Lien against the Property. Ex. 8. Whitty knew or should have known that the WBS invoices were not paid when he received the draw from Bauer's lender in January 2023. Whitty testified that he had not paid the invoices because there

draws the LLC received from Bauer's lender in large part reimbursed the LLC for expenses and costs already paid.

[11] Whitty also testified that the crew with Preferred Electric notified him that Bauer had requested changes and given instructions that were in addition to or inconsistent with the contract specifications and Whitty's instructions. Bauer objected to this testimony as hearsay. The Court has not considered this testimony for its truth—i.e., that Bauer in fact requested changes that increased the cost of the electrical work. But consideration of out-of-court statements is permissible as evidence of the effect on the listener. *Torry v. City of Chicago*, 932 F.3d 579, 585 (7th Cir. 2019) ("Statements introduced to show their effect on the listener, rather than the truth of the matter they assert, are not hearsay."). When considered for that purpose, the statements from the Preferred Electric crew provide support for Whitty's belief that the funds paid to the LLC were not intended to cover all the charges from the electrician because the changes Whitty believed Bauer had requested weren't part of the contract price.

was a dispute regarding the amount owed; he believed the LLC had been charged for items that had not been delivered. *See Loehrke v. Wanta Builders, Inc.*, 151 Wis. 2d 695, 698, 445 N.W.2d 717, 719 (Ct. App. 1989) ("We conclude that a contractor who fails to pay the subcontractor because of a bona fide dispute as to the amount due has not violated a fiduciary duty under [Wis. Stat. § 779.02(5)]."). Whitty appears to agree that some portion of the invoices was legitimate and had not been paid. But, as explained, Whitty claimed to have a belief that the project funds were exhausted on other items, including an ever-changing scope of the project. Remodeling projects, like the one at issue in this case, are often over budget. Exhausting the budget before all costs are paid does not amount to a breach of fiduciary duty. *See State v. Keyes*, 2008 WI 54, ¶ 21, 309 Wis. 2d 516, 528, 750 N.W.2d 30, 36 ("In case of deficiency, the claims are to be paid proportionately."); *Capital City Sheet Metal, Inc. v. Voytovich*, 217 Wis. 2d 683, 578 N.W.2d 643 (Ct. App. 1998) (defendant was not liable for theft by contractor where plaintiff subcontractor did not receive payment because all funds received for the project were used to pay other subcontractors and persons furnishing labor and materials). Underbidding a project and then not having funds to finish might be breach of contract, but it is not a non-dischargeable breach of fiduciary duty. Whitty's testimony suggests that he believed the funds for the project were exhausted, not that the LLC was breaching its fiduciary duty.

Fourth, Bauer relies on statements in the draw requests that Whitty submitted to obtain draws from Bauer's lender. Dkt. No. 35 at 12. Each request

states that the LLC has "requested a payment in the amount shown as the Total on the attached schedule for the purposes of paying the people and companies shown on the schedule, and no others . . . ." Exs. 31, 33, 36. Bauer says Whitty should have known that the money drawn from the lender was intended for project expenses and that the LLC did not, in fact, use the money for project expenses.

Bauer points to three items in the draw requests that Whitty purportedly lied about. In the first draw request, Whitty included $3,000 for "Restoration Water Damage," which is the mold remediation work that Bauer paid for. Ex. 31 at 3. Bauer argues that Whitty told him the LLC would give Bauer a credit or would reimburse him for the payment, which never happened. Whitty explained that he needed to include the item on the draw request to obtain the money from Bauer's lender; both Whitty and Bauer agreed that the funds for the mold remediation would come from Bauer's loan. In an email discussion on the subject in October of 2022, Bauer stated, "Happy to get reimbursed for any of it as I'm sure I'll come up with some other ways to spend money on this ole house!" Ex. 196. In the same email and contemporaneous oral conversations, the parties had been discussing various changes that Bauer wanted. Whitty credibly testified that he interpreted Bauer's email to mean that the $3,000 from the mold remediation should be credited to other expenses on the project. Given the many changes Bauer requested and the additional associated expenses, Whitty's interpretation is not unreasonable.

In the second draw request, Whitty included a line for "vanity/cabinets/tops" for $7,000. Ex. 33 at 3. Bauer paid $3,965.25 for a vanity and expected to be

reimbursed for that. Whitty told Bauer, "Since you ordered the vanity you would get a credit for that or we can figure out how to reimburse you . . ." Ex. 196. Bauer says he was never credited or reimbursed for the vanity, which he argues is evidence of Whitty's knowledge of misappropriation of the trust funds. The Original Contract included an allowance of $6,000 for "Provide/install new double sink vanity base cabinets/sinks/faucets/mirrors/vanity lights." Ex. 11 at 11. Whitty testified that the line item would include all labor and materials. Bauer presented no evidence that the cost of the materials other than the vanity and the labor to install it all was less than $6,000. Bauer chose many finishes throughout the house that were a significant upgrade from the allowance that Whitty had included in the contracts. The "custom concrete vanity" appears to be just such an upgrade. *See* Ex. 23 at 17. Had Bauer been reimbursed for the entire cost of the vanity, that would have left just $2,000 for the remaining materials and all the labor. The Court finds that Whitty's failure to immediately reimburse Bauer for the vanity is not evidence of his knowledge that the project funds were misappropriated.

Bauer also points to Whitty's promise to reimburse Bauer for $4,500 he spent on a fireplace because that amount was included in the LLC's second draw request. Ex. 33 at 2. However, the LLC did reimburse Bauer the $4,500 by way of a credit against the amount due under CO2. *See* Ex. 15 at 2. Had Bauer not received the credit, he would have had to pay $14,229.90 for the changes he requested; instead, he paid just $9,729.90. *Id.* Bauer received the credit in August 2022 when CO2 was signed, but the LLC did not receive the funds from Bauer's lender to reimburse

the LLC for the credit against CO2 until October 2022. Bauer attempts to navigate this inconvenient fact by arguing that he didn't really receive the credit because the LLC never finished the work contemplated under CO2. That may be a good argument for breach of contract, but it does not mean Whitty had knowledge of or intent to misappropriate project funds.

In sum, the Court finds that Bauer did not present sufficient evidence to establish Whitty's knowledge of the LLC's misappropriation of funds or intent to misappropriate funds. Nor did Whitty consciously disregard a known risk. The large project was made more complex by a shifting scope of work due to Bauer's requested changes.

## II. WHITTY'S COUNTERCLAIM UNDER 11 U.S.C. § 362(k)

In response to Bauer's adversary complaint, Whitty filed a counterclaim seeking damages under 11 U.S.C. § 362(k) based on Bauer's March 2024 emails after Bauer received notice of Whitty's bankruptcy filing. Whitty alleges that Bauer's emails caused him to suffer significant stress and asserts that he is entitled to actual damages, including costs and attorney's fees, for Bauer's willful violation of the automatic stay. Dkt. No. 38 at 17-20. Bauer argues that the email was directed to the LLC, not Whitty individually, and that Whitty has at most shown a technical violation of the automatic stay and has failed to prove any damages. Dkt. No. 35 at 28-29. After considering the evidence presented at the trial, the Court concludes that Whitty did not suffer any compensable damages from Bauer's conduct.

"[F]iling a petition for bankruptcy automatically 'operates as a stay' of creditors' debt-collection efforts outside the umbrella of the bankruptcy case." *Ritzen Grp., Inc. v. Jackson Masonry, LLC*, 589 U.S. 35, 37 (2020) (citing 11 U.S.C. § 362(a)). Section 362 also provides that "an individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." 11 U.S.C. § 362(k)(1). "Recovering damages for a stay violation requires the debtor prove, by a preponderance of the evidence, that (1) a bankruptcy petition was filed; (2) the debtor is an individual under the automatic stay provision; (3) the creditor had notice of the petition; (4) the creditor's actions were in willful violation of the stay; and (5) the debtor suffered damages." *In re Sori*, 513 B.R. 728, 732 (Bankr. N.D. Ill. 2014)

In this case, the first three elements of Whitty's claim are easily satisfied. It is clear that Whitty is an individual who filed for relief under chapter 7 of the Bankruptcy Code on January 5, 2024, and Bauer had notice of Whitty's bankruptcy when he sent his March 28 and 29 emails to Whitty. *See* Ex. 30.

As to the fourth element, the Court finds that Whitty established that Bauer's emails were sent to Whitty in willful violation of the automatic stay. "A willful violation does not require specific intent to violate the stay; it is sufficient that the creditor takes questionable action despite the awareness of a pending bankruptcy proceeding." *In re Radcliffe*, 563 F.3d 627, 631 (7th Cir. 2009). "[T]he term 'willful' refers to the deliberateness of the conduct, coupled with knowledge of

the filing. It does not require an intent to violate the law." *In re Schafer*, 315 B.R. 765, 775 (Bankr. D. Colo. 2004).

Bauer argues that his emails were intended to make a claim against the LLC based on the parties' contracts, and that he was not making a demand against Whitty personally. Dkt. No. 41 at 18. Bauer also points out that Whitty acknowledged at trial that there was no contract between Bauer and Whitty personally. Dkt. No. 35 at 29. Bauer further argues that to the extent that his violation of the stay was inadvertent or a mere technical violation. *Id.* at 29 (citing *In re Frasier*, 613 B.R. 271, 276 (Bankr. W.D. Wis. 2020)).

The Court finds that Bauer's post-hoc rationalization of his intent in sending the emails is not credible. The emails plainly were addressed to Whitty directly, not to the LLC: "I can only assume *you* did and presently do not actually intend to repay me"; "If *you* intend to make payment . . . let me know and we can discuss"; and "I will assume non-payment . . . to mean *you* are refusing to repay me . . . ." Ex. 210 at 1-2 (emphasis added). At the time he sent the emails, Bauer knew the LLC was insolvent, or nearly so, and that it was no longer operating. Indeed, Bauer had requested several months earlier that Whitty sign an agreement making him personally liable for the LLC's obligations under the contracts due to the LLC's insolvency. *See* Ex. 28.

Bauer's testimony that he believed the emails were necessary before he could have a claim against the LLC lends further support to the Court's finding. Bauer is a lawyer. Yet he made no effort to explain how his emails to Whitty, which make no

mention of the LLC, were a prerequisite to enforcing his legal rights, if any, against the LLC. Bauer also should have known that the stay imposed by § 362(a) prevented him from making any demand to Whitty personally. That Bauer, as a lawyer, made no effort in his emails to distinguish between Whitty (to whom he could not lawfully send a demand letter) and the LLC is baffling at best. In addition, Bauer's complete inability to provide any information about the other lawyer who supposedly gave him advice before he sent the emails is likewise troubling.

Bauer had knowledge of the bankruptcy filing; he knew or should have known about the stay imposed by § 362(a); and he deliberately sent an email to Whitty that did not distinguish between Whitty's personal liability and the LLC's liability. Bauer's actions were a willful violation of the stay.

Whitty's claim fails at the final element because he suffered no damages from Bauer's conduct. Whitty argues that Bauer's actions caused harm because he viewed the email "as a shakedown," which led to significant stress. Dkt. No. 38 at 19-20. Whitty also seeks to recover his attorney's fees for pursuing his counterclaim against Bauer based on the violation. Neither category of damages is compensable in this case.

The Seventh Circuit has made clear that damages for emotional distress, standing alone, are not available for violations of the automatic stay. *Aiello v. Providian Financial Corp.*, 239 F.3d 876, 879-80 (7th Cir. 2001) (debtor who suffered only fleeting emotional injury as a result of creditor's extortionate methods

to coerce reaffirmation agreement could not recover for purely emotional injuries under § 362(k) because bankruptcy code provides remedy for "financial" damages, not for harm to a debtor's "peace of mind"); *see also Braatz v. Check & Cash LLC (In re Braatz)*, 610 B.R. 887 (Bankr. E.D. Wis. 2019) (noting a debtor "cannot recover emotional-distress damages under § 362(k)(1) itself and must instead assert a separate claim for which such damages are recoverable"). Accordingly, Whitty's request for emotional distress damages under § 362(k)(1) must be denied.

Whitty also cannot recover attorney's fees under the circumstances of this case. Courts in the Seventh Circuit may award attorney's fees for a creditor's willful violation of the automatic stay when a debtor suffers some emotional distress, but no other harm, if the violation forced the debtor to incur legal fees and/or resort to court intervention to enforce his rights. *See, e.g., Braatz*, 610 B.R. at 890 (debtor entitled to recover attorney's fees for commencing adversary proceeding due to creditor's postpetition wage garnishment); *Baggs v. McClain Ford-Mercury, Inc. (In re Baggs)*, 283 B.R. 726 (Bankr. C.D. Ill. 2002) (attorney's fees awarded after creditor continued to send threatening collection statements after receiving notice of bankruptcy filing and reminder letter from debtor's counsel). However, courts have declined to award attorney's fees where legal assistance was not necessary to protect the debtor's rights. *See In re Grantham*, 646 B.R. 441, 443 (Bankr. E.D. Mich. 2022) (declining to award fees because "[t]he only attorney fees and costs that are alleged or apparent are those incurred by the Debtor in connection with filing and prosecuting the Motion," which "could have and

should have been avoided"); *In re Prusan*, 495 B.R. 203, 208 (Bankr. E.D.N.Y. 2010) (noting that "the fees and costs must be reasonable and necessary" and may not include "unnecessary litigation costs").

Here, the attorney's fees claimed by Whitty were unnecessary litigation costs. Damages are an essential component to a claim under § 362(k)(1). If a debtor is forced to consult an attorney to remedy a creditor's violation of the stay, the resulting legal fees may be the debtor's damages. For example, if a debtor's counsel is required to intervene to dismiss or stay litigation filed or continued in violation of the automatic stay, or if counsel must take action to prevent a creditor from sending letters or emails or making telephone calls, then the debtor may claim the resulting fees as damages (and might be able to include the additional fees incurred in prosecuting a motion or adversary proceeding under § 362(k)). A debtor cannot, however, manufacture damages where none exist by filing a motion or adversary proceeding. By the time Whitty filed his counterclaim, Bauer had ceased demanding payment to Whitty directly and had filed this adversary proceeding seeking to have the debt declared nondischargeable. Litigation to remedy the violation was unnecessary.

Attorney's fees in cases like this are all the more unnecessary where punitive damages are not warranted. Punitive damages may be awarded in "appropriate circumstances." 11 U.S.C. § 362(k)(1). "[W]hen a stay violation is no worse than 'willful' . . . an award of punitive damages is not warranted. The violative conduct must also be egregious or reprehensible." *Braatz*, 610 B.R. 887 at 892.

> The primary purpose of punitive damages awarded for a willful violation of the automatic stay is to cause a change in the creditor's behavior; the prospect of such change is relevant to the amount of punitive damages to be awarded. Factors to be considered for an award of punitive damages for a willful violation of the automatic stay include the following: the nature of the creditor's conduct, the nature and extent of harm to the debtor, the creditor's ability to pay damages, the level of sophistication of the creditor, the creditor's motives, and any provocation by the debtor.

*In re Shade*, 261 B.R. 213, 216 (Bankr. C.D. Ill. 2001) (citations omitted).

There is insufficient evidence to demonstrate that Bauer's March 2024 emails were sent in bad faith or with malice toward Whitty. The offending communications were brief in duration and limited to two emails over just two days. At most, Bauer's actions demonstrated poor judgment, while he himself was also experiencing stress related to the renovation project.

**CONCLUSION**

In sum, Bauer did not present evidence from which the Court could conclude that Whitty in fact knew that the LLC held the project funds in trust and had concomitant fiduciary duties with respect to the funds. Bauer therefore did not prove that Whitty acted with the requisite intent to have any debt for theft by contractor declared nondischargeable under 11 U.S.C. § 523(a)(4). On his counterclaim, Whitty did not present sufficient evidence for an award of compensatory or punitive damages under 11 U.S.C. § 362(k). The Court will enter a separate order consistent with this Decision.

# # #